# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

DORON A. A.,[1]

                Plaintiff,

v.                                      ACTION NO. 2:22cv163

KILOLO KIJAKAZI,
        Commissioner of Social Security,

                Defendant.

## UNITED STATE MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Doron A. ("plaintiff") brought this action, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a decision of the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying his claim for benefits under Title II of the Social Security Act.

An order of reference assigned this matter to the undersigned. ECF No. 7. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is recommended that plaintiff's motion for summary judgment (ECF No. 9) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 11) be **GRANTED**.

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons.  Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S., Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

# I.    PROCEDURAL BACKGROUND

Plaintiff applied for disability insurance benefits on February 21, 2019, alleging disability beginning December 14, 2016, because of gout, carpal tunnel syndrome ("CTS"), right wrist fusion, arthritis, hypertension, and depression.[2] R. 15, 18, 59–60, 211, 227. Plaintiff later amended the alleged onset date to January 30, 2019. R. 45–46. Plaintiff's date last insured for purposes of disability insurance benefits is December 31, 2021. R. 59, 73, 256.

After denial of his benefits claim both initially and on reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). R. 59–71, 73–85, 111–13. ALJ Jeffrey Jordan heard the matter on June 17, 2021, and issued a decision denying benefits on July 23, 2021. R. 15–25, 31–58. On February 28, 2022, the Appeals Council denied plaintiff's request for review of the ALJ's decision. R. 1–5. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 404.981.

Having exhausted administrative remedies, plaintiff filed a complaint on April 19, 2022. ECF No. 1. The Commissioner answered on June 17, 2022. ECF No. 5. The parties filed motions for summary judgment, with supporting memoranda, on July 27 and August 19, 2022, respectively. ECF Nos. 9–12. Absent special circumstances requiring oral argument, the case is deemed submitted for a decision.

# II.    RELEVANT FACTUAL BACKGROUND

Plaintiff presents three issues on appeal. He first argues that ALJ erred in setting a residual functional capacity ("RFC") that included a frequent ability to handle and finger with the left hand.

---

[2] Page citations are to the administrative record that the Commissioner previously filed with the Court.

Pl.'s Br. in Supp. of Summ. J. ("Pl.'s Br."), ECF No. 10, at 5–7.  Plaintiff claims this error flows from the ALJ's misreading of the notes from an April 9, 2021 orthopedic exam as indicating that plaintiff described his left wrist as "fine."  *Id.*  In fact, he complained of bilateral wrist pain, which objective findings and x-rays confirmed, resulting in prescribed treatment of bilateral steroid injections and bilateral wrist braces.  *Id.*  Second, plaintiff argues that the ALJ failed to address a conflict arising between the RFC limitations in the ALJ's hypothetical and the job requirements in the Dictionary of Occupational Titles for three of the four jobs identified by the vocational expert ("VE").  *Id.* at 7–8.  Finally, plaintiff argues that a fourth job (usher) identified by the VE does not exist in significant numbers in the national economy.  *Id.* at 9–10.  As a result, plaintiff argues that the limited availability of such work cannot support a denial of disability benefits.  *Id.* at 10.  The Court's review of the facts below is tailored to such arguments.

## A.    *Background Information and Hearing Testimony by Plaintiff*

Plaintiff testified by telephone before ALJ Jordan on June 17, 2021. R. 33, 35, 39–54.  At that time, he was 43 years old, separated from his spouse, and living with his mother. R. 36, 39.  Plaintiff is the father of four children who apparently live with his spouse, including two who recently graduated from high school and a 16-year-old daughter. R. 39, 42, 409.  Plaintiff is a high school graduate, who also attended one year of college. R. 40, 228.

Before mostly stopping work in or around January 2019, plaintiff worked for 13 years as a factory worker and blender operator with Kraft Foods. R. 37, 44–46, 227.  Plaintiff operated and used a machine to blend trail mix, which work included regularly lifting items weighing 70 pounds, working on his feet for most of the day, adjusting and cleaning the machine, and throwing away boxes. R. 44–45. After stopping work due to his conditions and placement on long-term disability, R. 37, 41–42, 215, plaintiff tried to go back to work; first, as a school custodian in 2019, and

second, as a part-time, "back-line cook" at a fast food restaurant in 2020, R. 43–44, 46. Because of problems with his hands, however, he could not sustain either job. R. 46–47; R. 47–48 (describing hand issues as including pain, problems with gripping and dropping items, and holding and using small objects, such as a pen).

Plaintiff is right-handed and regularly experiences significant, dull, throbbing pain in that hand, which he identified as the most problematic. R. 47, 49, 52 (noting continuing struggle to use right hand following steroid injection on April 8, 2021). Using a 10-point scale, plaintiff described his hand pain as "probably a 5 or 6 every day." R. 50. Plaintiff also sometimes has problems with his left hand. R. 49. To treat his hand pain, plaintiff had ligament and fusion surgery on his right hand, ligament surgery on his left hand, receives injections, engages in physical therapy and home exercises, and takes medication. R. 37, 49–50; *see* R. 50 (testifying that medication "make[s] [him] comfortable").

Plaintiff also experiences occasional flare-ups of gout, usually affecting his feet and knees on either side of his body. R. 52–53 (reporting six "flares" through mid-2021). These episodes last from three to four days, on the short end, to as long as one to two weeks. R. 53. Such episodes affect his ability to work because, to minimize the pain, plaintiff limits his walking and reclines on a couch or sits with his legs raised. R. 53–54.

Plaintiff's hand condition affects "everything," including his ability to cook, dress, clean, and sometimes drive. R. 48 (noting he drops "a lot of things"). Plaintiff is licensed, drives short distances, such as to the store and to pick up his kids at school, and does so by using his left hand to hold the steering wheel. R. 42, 48. Similarly, plaintiff uses his left-hand for various personal care tasks, including showering. R. 49. Plaintiff performs minor household chores, such as cleaning, dusting, and dishwashing, in five to ten minute increments, and takes breaks as needed.

4

R. 51–52.  Likewise, to manage hand pain when using a computer, plaintiff types one paragraph at a time, then takes a break before resuming.  R. 52.  When not performing such tasks, plaintiff spends his days mostly watching TV and solving puzzles to keep his mind focused.  R. 50.  Due to his decreasing mobility over the last few years, plaintiff reports that his weight increased by 70 pounds.  R. 40.

Plaintiff submitted a detailed function report to the SSA on January 21, 2020.  R. 239–46.  Plaintiff reports effectively being unable to work because of limitations in lifting, climbing stairs, and overhead and other reaching.  R. 239.  He reports using hand braces every day, mostly at night, and also using crutches when his gout flares up.  R. 245.  Plaintiff also checked boxes indicating that his conditions affect his abilities to:  lift, squat, bend, reach, climb stairs, complete tasks, and use his hands.  R. 244 (noting he could not lift more than 20 pounds).  Although he reports being able to walk about one-half mile before needing to stop and rest, plaintiff cannot do yard work.  R. 240, 242, 244.  Plaintiff lives independently, handles his own finances, and prepares meals for himself and his children, but says he cannot mix, blend, cut, or chop foods, and is limited to fixing sandwiches when having significant pain and swelling.  R. 240–43 (noting that the time needed to perform such tasks depends on the extent of his pain, which also affects his ability to sleep at night).  Plaintiff helps care for his children, socializes with others and attends church when not in pain, gets outside the house without need of assistance (by walking, driving, riding with others, and taking public transportation), and shops at the store or online.  *Id.*  He has no difficulties with paying attention, concentrating, following instructions, getting along with others, and handling stress.  R. 244–45.  Plaintiff suffers from depression and unusual fears due to his conditions and has sought counseling.  R. 241, 245.

## B.    *Hearing Testimony by Vocational Expert*

Linda Augins, a vocational expert ("VE"), also testified at the hearing. R. 55–57, 279–82. The ALJ presented VE Augins with two hypotheticals premised on a person of plaintiff's age, education, work history, and RFC, for work at no more than light exertional levels. R. 55. The ALJ's first hypothetical assumed a hypothetical person:  (1) limited to occasional pushing and pulling with upper extremities; (2) who must avoid crawling and climbing and who can frequently perform other postural movements; (3) who must avoid fast-paced tasks, including assembly-line jobs with production quotas; (4) limited to frequent fingering, grasping, handling, and reaching with the nondominant upper extremity and to occasional such use with the dominant upper extremity; and (5) who must avoid hazards such as moving, dangerous machinery and unprotected heights.  *Id.*   VE Augins testified that such a person could not perform plaintiff's past relevant work as a blender operator.  *Id.*

VE Augins also testified that such a person could work as a ticket taker, with roughly 16,000 jobs in the national economy, as an usher, with roughly 5,000 jobs in the national economy, and as a mail sorter, with roughly 23,000 jobs in the national economy.  R. 56 (identifying all positions at the light exertional level).  She also testified that such a person could work at the sedentary job of telephone information clerk, with roughly 10,000 jobs in the national economy. *Id.* (noting that other positions required frequent bilateral use of the upper extremities). VE Augins testified in response to the second hypothetical that, if such a person was limited to occasional handling bilaterally, no work would be available.  *Id.*

The ALJ then inquired if the job requirements in the Dictionary of Occupational Titles ("DOT")[3] conflicted with the hypothetical limitations initially identified.  *Id.*   VE Augins

---

[3] The *Dictionary of Occupational Titles*, and its companion, *Selected Characteristics of*

responded that the hypothetical was more detailed in specifying only occasional pushing and pulling with the upper extremity and in drawing the frequent versus occasional distinction between the use of the nondominant and dominant extremities. R. 56–57. Though noting that these detailed limitations were not addressed in the DOT, VE Augins testified that she concluded that the hypothetical person could work at the four jobs based upon her own professional experience. *Id.* In response, plaintiff's attorney declined to question the VE, but claimed that the record supported the ALJ's second hypothetical. R. 57.

### C.    *Relevant Medical Record*

#### 1.    *Treatment with Wardell Orthopaedics, P.C.*

Plaintiff received orthopedic treatment at Wardell Orthopaedics from February 2015 through March 2019, as well as therapy from an affiliated entity, Harbour Rehabilitation. R. 339, 351, 355. Plaintiff received treatment on approximately four occasions in 2015, for various knee, shoulder, and wrist ailments. R. 347–51. On August 6, 2015, Dr. Karl Bowman, Jr., referred plaintiff to occupational therapy for "extensor carpi ulnaris tendinitis [and for] carpal tunnel syndrome (right)." R. 347 (ordering eight therapy treatments).

During 2016, plaintiff treated with Dr. Bowman on approximately five occasions, and received physical therapy on two other occasions. R. 340–46, 353–55. On April 22, 2016, plaintiff complained of discomfort in his right hand, but said that his wrist was "OK." R. 344. A physical exam revealed tenderness in the right hand at the base of the third and fourth metacarpals and limited dorsiflexion in the right wrist. *Id.* On May 24, 2016, plaintiff stated that his right hand

---

*Occupations Defined in the Revised Dictionary of Occupational Titles*, are resources used by the SSA that review occupations present in the national economy and discuss physical and mental requirements pertaining to those occupations. *U.S. Dep't of Labor, Dictionary of Occupational Titles* (4th ed. 1991); *U.S. Dep't of Labor, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* (1993).

was "doing okay" and had improved some, but that he still had pain with range of movement and in gripping objects. R. 343 (noting pain levels of 3 to 4 out of 10 and that Mobic had "helped"). A physical exam revealed tenderness in plaintiff's left dorsal wrist area. *Id.* An order for physical therapy (two times/week for two treatments) listed a diagnosis of "post-traumatic osteoarthritis right wrist, bilateral wrist scapholunate issufficia" with an onset date of February 2015. R. 346. On June 21, 2016, plaintiff reported that both wrists ached, but were doing "a little better," and that the left was worse than the right. R. 342. On September 19, 2016, plaintiff reported aching in both hands at pain level 4. R. 341. On December 20, 2016, although reporting that his wrists felt "okay," plaintiff said that recent weather caused them to ache, that he had bilateral pain in the thumb area, and rated his pain at level 7. R. 340. Dr. Bowman signed a work note continuing plaintiff's current restrictions pending his next evaluation in 90 days. R. 353.

Dr. Bowman saw plaintiff on approximately three occasions in 2017. R. 304–13. On March 28, 2017, he issued a work note directing that plaintiff remain on his current restrictions, pursuant to the functional capacity evaluation, until a reevaluation in six months. R. 304.

On September 21, 2017, plaintiff described his pain as going "back and forth between [his] hands" for the last month and noted he had some intermittent numbness and tingling "mostly in the right hand." R. 305, 307. A physical exam of the right wrist revealed: (1) an earlier dorsal incision scar; (2) "snuffbox tenderness"; (3) intact ulnar motor nerve function; (4) reduced grip strength, as compared to the left wrist; and (5) less extension on the right as compared to the left wrist. R. 308. Bilateral wrist x-rays showed, among other things, evidence of a "previous right wrist scaphocapitate fusion with associated degenerative changes," and early sclerosis of the scaphotrapezial and lunotriquetral joints in the left wrist. *Id.* Treatment plan notes indicate that plaintiff also told Dr. Bowman about "6 flares in the last month," and Dr. Bowman told him to

expect such flares of symptomatic wrist osteoarthritis up to one a week. R. 309. The treatment plan described plaintiff as unemployed and unable to return to work under the restrictions identified in the functional capacity evaluation. *Id.* Noting plaintiff's interest in pursuing disability, Dr. Bowman reportedly stated that he did "not think this is unreasonable." *Id.* On October 26, 2017, plaintiff returned and expressed concern over the lack of improvement in and increasing and constant pain (level 5) in his right hand, near the thumb. R. 310–11. A physical exam found plaintiff's right hand to be unchanged, with a well-approximated dorsal wound, and found tenderness at the dorsal radioscaphoid junction. R. 312. Dr. Bowman referred plaintiff to a specialist for possible additional treatments for the right wrist. R. 311–12.

Dr. Bowman treated plaintiff two times in 2018. R. 314–21. On March 20, 2018, plaintiff advised that he could not see the specialist for financial reasons. R. 314. During this visit, plaintiff reported having continued right wrist soreness with repetitive use, grip problems, and requested a prescription for anti-inflammatory medicine. R. 315. Dr. Bowman's exam found the wrist to be tender, with limited dorsiflexion, with "clicking with Watson's scaphoid shift testing," but noted that the right grip strength exceeded that on the left. R. 316. He prescribed refills for Mobic and again recommended seeing a surgical specialist. R. 316–17. On September 28, 2018, plaintiff reported "no changes" and was "doing okay." R. 320 (noting aching and discomfort with weather changes and repetitive use). An exam again revealed limited dorsiflexion in the right wrist, when compared to the left, crepitation with range of motion, and clicking with shift testing. R. 321. Plaintiff's left and right grip strength numbers were roughly comparable. *Id.* Dr. Bowman continued the prior finding of post-traumatic osteoarthritis of the bilateral wrists and reported the condition as permanent and unlikely to improve. *Id.* Although identifying other treatment options including corticosteroid injections and immobilization, a wrist arthroscopy, or fusion, Dr. Bowman

9

assessed that they were unlikely to markedly improve plaintiff's functional ability. *Id.*

Dr. Arthur Wardell took over plaintiff's treatment during 2019. R. 323–39. On January 17, 2019, plaintiff complained of a worsening, dull, aching pain in his right wrist. R. 325. Examination revealed volar wrist and radiocarpal tenderness, with both limited flexion and extension of the right wrist. R. 323, 326. An x-ray revealed narrowing of the radiocarpal joint space. R. 326. Dr. Wardell placed plaintiff on additional work restriction, directed use of a wrist brace as needed, and prescribed Diclofenac. R. 326–27. Plaintiff returned early to treat with Dr. Wardell on February 14, 2019, due to increased pain at level 8. R. 329. An exam revealed swelling and tenderness over the radiocarpal joint. R. 331. Dr. Wardell applied a short arm cast to plaintiff's right wrist and identified him as a candidate for either a steroid injection or a radiocarpal wrist fusion, if symptoms continued. R. 331–32. On February 22, 2019, Dr. Wardell noted plaintiff "did well with his cast," making him a suitable candidate for right wrist fusion and plaintiff consented to the same. R. 335–36. On March 22, 2019, however, Dr. Wardell recommended seeking a second opinion. R. 339. Plaintiff reported that his right wrist felt "OK" at that time and an exam found limited extension and flexion, along with diffuse radiocarpal tenderness. R. 337, 339.

On August 8, 2019, Dr. Wardell completed a medical source statement, which identified plaintiff's conditions as post-traumatic osteoarthritis of the right and left wrists. R. 428. As for signs and symptoms, Dr. Wardell only placed a check next to "shoulder pain," and made no markings next to "hand/wrist pain." *Id.* He placed check marks indicating that plaintiff could only lift 10 pounds or less on rare occasions and could never lift items weighing 20 or 50 pounds. *Id.* He indicated that plaintiff could sit or stand/walk at least six hours in a regular workday and that he did not need any assistive device to aid with walking or to elevate his legs. *Id.* As for both

plaintiff's left arm/hand and right arm/hand, Dr. Wardell opined that during a regular workday plaintiff would rarely be able to reach and occasionally be able to handle, grasp, and finger. *Id.* Finally, Dr. Wardell estimated that due to his conditions and associated pain, plaintiff would miss three days of work per month. *Id.*

 2. ***Treatment with David Ramstad, M.D.***

Plaintiff has an extensive history of treatment with Dr. Ramstad, his primary care physician dating to 2016. *See, e.g.*, R. 408–11, 434. Dr. Ramstad, however, primarily treated plaintiff for gout, associated foot pain, and hypertension, which are not at issue in the present appeal. *See, e.g.*, R. 387, 406, 410. These treatment records also note that plaintiff's medical history includes "[r]ight wrist surgery for ruptured ligament." *See, e.g.*, R. 408.

On January 3, 2018, plaintiff reported to Dr. Ramstad that he was seeing an orthopedist for carpal tunnel syndrome ("CTS"), which has caused him to be out of work for two years, and that he planned to have surgery on his right hand. R. 388 (noting also that he twice applied for and was denied disability). On December 17, 2018, plaintiff told Dr. Ramstad that he had returned to and was now back out of work, after having soreness in both elbows and problems with his hands. R. 381.

On January 18, 2019, plaintiff reported to Dr. Ramstad that he continued to have problems with hand pain, dating back years, and was treating with Dr. Wardell. R. 377. Plaintiff advised that he planned to have surgery for CTS. *Id.*; *see* R. 373 (reporting the same on February 6, 2019). On February 22, 2019, Regan Brecke, a physician's assistant ("PA"), treated plaintiff, who again reported being scheduled for right wrist surgery and complained of chronic problems with both hands and wrists. R. 370. PA Brecke noted a cast on plaintiff's right wrist/hand. R. 371.

### 3. *Treatment Records from Sentara Hospital System*

On April 20, 2016, plaintiff went to the emergency department at Sentara Obici Hospital and complained of right hand pain and swelling lasting one week.  R. 470.  Hospital patient history records reflect a surgical ligament repair on the right wrist on an unspecified date and extensor tenosynovectomy surgery on the left wrist on January 11, 2013.  R. 471.  A physical exam of the right hand revealed decreased range of motion, swelling, tenderness (including on the bone), but the absence of any deformities or cuts, and normal sensation, two-point discrimination, capillary refill, and strength.  R. 472 (noting "diffuse mild tenderness to dorsum of r[ight] hand").  Plaintiff was discharged with a prescription for Percocet.  R. 470, 473.

On March 28, 2020, plaintiff returned to the emergency department and complained of left wrist and hand pain, increasing over the prior 48 hours, and noted that he ran out of gout medication about a month earlier.  R. 88–89, 585.  An exam revealed "exquisite tenderness to palpitation," with mild swelling above the left wrist, and noted plaintiff's sensation and finger and thumb movement were intact.  R. 586.  Plaintiff received three prescription refills for gout medications and one for hypertension and was discharged under a diagnosis of "acute gouty arthritis."  R. 584–85, 587.

### 4. *Treatment Records from Bon Secours Hospitals and Medical Group*

On May 12, 2017, plaintiff went to the emergency department at the Maryview Medical Center complaining of pain in his right wrist lasting three days, attributable to his gout, for which he ran out of medication the day before.  R. 503.  A past medical history referenced bilateral wrist surgery in 2008 and 2011.  *Id.*  A physical exam revealed increased pain with movement over a normal range of motion, but tenderness (mild and diffuse) in the right wrist, without swelling.  R. 504.  The treating physician diagnosed "[a]cute idiopathic gout of right wrist" and wrote

12

prescriptions for Indocin and Percocet.  R. 504–05.

On April 2, 2019, plaintiff sought treatment at the emergency department for complaints of right hand pain lasting two days.  R. 500 (noting report of hand injury dating back eight years, with present complications due to injury and earlier surgery).  Plaintiff advised that, despite a pending appointment with a surgeon, he was sent to the hospital for worsening symptoms and pain. R. 501.  Plaintiff declined a cortisone injection, noting that he received them before and they no longer provide relief.  *Id.*  A physical exam revealed localized tenderness over the volar aspect of the right wrist—the distal ulnar styloid area—without neurovascular issues in the right hand and fingers.  R. 502.  The treating physician prescribed several days of pain medication, pending the appointment with the orthopedist.  *Id.*

On April 5, 2019, plaintiff received treatment from Dr. Shawn Wilson of the Virginia Orthopaedic and Spine Specialists, as part of the Bon Secours Medical Group.  R. 498–500, 625. Plaintiff complained about a lengthy history of right wrist pain, localized to the ulnar aspect distal to the ulnar styloid, but conveyed that his left wrist was "doing fine."  R. 498–99.  Dr. Wilson's physical exam found tenderness over the lunotriquetral joint and possibly the ulnar triquetral joint, and pain with the full range of motion, along with ulnar deviation and wrist flexion and extension. R. 499.  Bilateral wrist x-rays were taken; with findings of no severe degenerative changes on the left; some moderate degenerative changes and osteophyte changes in the lunotriquetral and scapholunate joints in the right wrist; and mild to moderate degenerative changes at the radius scaphoid as well as radiolunate joints.  *Id.*  After discussing treatment options, including possible future wrist fusion, Dr. Wilson administered a steroid injection in the right wrist ulnar area and directed plaintiff to return in three months.  R. 500.

13

On July 15, 2019, plaintiff wore a wrist brace and told Dr. Wilson that the prior injection provided some relief, but a dull aching pain returned about a month earlier. R. 496. An exam of the right wrist revealed mild tenderness and some mild edema, but found plaintiff's sensation to be intact, with "near full" range of motion, and some pain at maximum flexion and extension. R. 497. After another discussion of possible surgical options, plaintiff agreed to another steroid injection given by Dr. Wilson, who also referred plaintiff to occupational therapy. R. 497–98.

On November 22, 2019, plaintiff again reported having right wrist pain to Dr. Wilson, whose exam found mild tenderness over the dorsal wrist, particularly at the ulnar aspect, with minimal pain on range of motion. R. 493–94; *see* R. 627 (noting that the prior injection "helped somewhat" but that pain returned with colder weather). X-rays of the right wrist revealed degenerative changes in the STT joint, lunocapitate joint, capital hamate joint, and lunotriquetral joint. R. 494. Dr. Wilson discussed treatment options, including surgical and non-operative treatments, noting that the best former option would be a total wrist fusion and that the latter options would include injection and therapeutic exercise. *Id.* Dr. Wilson told plaintiff that, in the absence of "severe pain with movement or any pain with movement," to consider injection and exercises. *Id.* He then administered another steroid injection into the right wrist. R. 494–95.

Plaintiff next saw Dr. Wilson on April 9, 2021. R. 625. This time plaintiff complained of bilateral wrist pain. R. 627. A physical exam found some swelling and synovitis in both joints, moderate tenderness in the radiocarpal joints and in the scapholunate joint, and plaintiff's sensation grossly intact. R. 629. X-rays of the left wrist were taken and showed moderate degenerative changes at the radiocarpal joint and midcarpal joints. *Id.* After discussion of surgical and nonsurgical options, Dr. Wilson administered bilateral steroid injections and directed the wearing of bilateral wrist braces for four weeks, and later as needed. R. 630. Treatment records reflect

14

diagnoses of post-traumatic osteoarthritis of both the left and right wrists. R. 631.

### 5. *Opinions of State Agency Experts*

On April 9, 2020, Robert McGuffin, M.D., opined on initial review that plaintiff could: (1) occasionally lift and/or carry 20 pounds; (2) frequently lift and/or carry 10 pounds; and (3) push and/or pull without limits, aside from those identified for lifting and carrying. R. 67. He also opined that plaintiff had no manipulative limitations. R. 68. In explaining his findings, Dr. McGuffin noted that plaintiff's gout appeared to be under control, with medication compliance, that plaintiff had not sought treatment for CTS since 2018, and that recent right wrist exams revealed only mild tenderness on the back of the wrist, with minimal pain over the range of motion. *Id.* He also detailed that x-rays of the right wrist showed only mild to moderate degenerative changes and that, following injections, plaintiff had not sought more treatment. *Id.*

On August 18, 2020, David Bristow, M.D., found the same exertional limitations, but found that plaintiff had more extensive manipulative limitations. R. 81–83. Dr. Bristow opined that plaintiff had limited handling ability with both hands, and unlimited abilities to reach, finger, and feel. R. 82. Dr. Bristow attributed the handling limitation to plaintiff's gout and bilateral wrist pain and specified that the limitation was occasional. *Id.* Dr. Bristow mostly adopted the initial RFC explanation, but also concluded that plaintiff's "conditions have not significantly impaired his ability to function appropriately" and supported the prior denial of disability. *Id.*

### III. THE ALJ'S DECISION

To evaluate plaintiff's claim of disability,[4] the ALJ followed the sequential five-step analysis set forth in the SSA's regulations. *See* 20 C.F.R. § 404.1520(a). The ALJ considered

---

[4] To qualify for disability insurance benefits, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability

whether plaintiff: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents him from performing any past relevant work given his residual functional capacity; and (5) had an impairment that prevents him from engaging in any substantial gainful employment. R. 16–25.

First, the ALJ determined that plaintiff met the insured requirements[5] of the Social Security Act through December 31, 2023, and had not engaged in substantial gainful activity from January 30, 2019, his amended, alleged onset date of disability, through July 23, 2021. R. 17.

At steps two and three, the ALJ found that plaintiff's osteoarthritis, gout, hypertension, obesity, and CTS constituted severe impairments. R. 18. The ALJ classified plaintiff's other impairments as non-severe. *Id.* The ALJ further determined that plaintiff's severe impairments, either singly or in combination, failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 18–19.

The ALJ next found that plaintiff possessed the RFC to perform a less than a full range of light work. R. 19–23. The ALJ also specified the following non-exertional limitations:

> the claimant is limited to occasional pushing and pulling with his upper extremities[;] . . . has to avoid crawling and climbing ladders, ropes and scaffolds, but he can perform other postural movements frequently[;] . . . has to avoid fast-

---

benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *accord* 42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a).

[5] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

paced tasks, such as assembly line jobs involving production quotas[;] . . . is limited to frequent fingering, grasping, handling and reaching, with his non-dominant extremity and occasionally with his domina[n]t[] upper extremity[; and ] . . . has to avoid working around hazards, such as moving dangerous machinery or unprotected heights.

R. 19.

At step four, the ALJ decided, based upon the VE's testimony, that plaintiff could not return to his past relevant work as a blender operator.  R. 23.

Having reviewed the DOT and the VE's testimony, at step five the ALJ concluded that plaintiff could perform existing jobs in the national economy, such as by working as a ticket taker, usher, mail sorter, or telephone information clerk.  R. 24.

Accordingly, the ALJ concluded plaintiff was not under a disability from January 30, 2019 through July 23, 2021, and was ineligible for disability benefits.  R. 25.[6]

## IV.    STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits.  42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th

---

[6] Though concluding that plaintiff was not disabled, on the last page of the decision the ALJ recites the initial alleged onset date (December 14, 2016), rather than the amended onset date (January 30, 2019).  R. 17, 25.

Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589 (citing *Hays*, 907 F.2d at 1456). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Coffman,* 829 F.2d at 517.

## V.   ANALYSIS

### A.   *The ALJ's RFC finding for frequent fingering, grasping, handling, and reaching with the left wrist and hand is supported by substantial evidence.*

Plaintiff seeks a remand arguing that the ALJ misstated an April 9, 2021 treatment record as noting plaintiff's left wrist was "doing fine" at that time, when, in fact, plaintiff sought and received treatment for bilateral wrist pain on that date. Pl.'s Br. 6, 10. Plaintiff argues that this note constituted the ALJ's sole basis for distinguishing between the occasional and frequent manipulative limitations set for the right and left wrists and hands. *Id.* at 6. Because the "severity of the right . . . and left wrist[s] were the same on April 9, 2021," plaintiff contends that the ALJ's finding that plaintiff could frequently use his left wrist and hand to reach and manipulate items

18

overstated the RFC, necessitating a remand. *Id.* at 6–7, 10. Plaintiff also asserts that this error was material and harmful because the VE testified that, "if handling and fingering were limited to 'occasional' with both hands, . . . no jobs would exist in the national economy." *Id.* at 7; *cf.* R. 56 (testifying that "[t]here would be no work . . . [i]f the individual was limited to occasional *handling* bilaterally") (emphasis added).

The Commissioner argues that substantial evidence supports the ALJ's RFC finding. Mem. in Supp. of Def.'s Mot. for Summ. J. and Opp. to Pl.'s Mot. for Summ. J. ("Def.'s Mem."), ECF No. 12, at 15–21. Although implicitly acknowledging that the ALJ erred in linking the statement that the "left wrist was fine" to the April 2021 appointment, the Commissioner argues that plaintiff ignores the ALJ's discussion of the findings made and treatment given at that time, as well as rest of the ALJ's decision. *Id.* at 16. Use of that wider lens, the Commissioner argues, shows that the ALJ selected an RFC premised upon the differing condition of and treatment rendered for plaintiff's left and right wrists and hands, rather than upon a mistake of fact. *Id.* at 16–17. As plaintiff cannot show any harm resulted from the ALJ's error, the Commissioner argues that no basis exists for a remand. *Id.*

The Court agrees with the Commissioner. As specified above, plaintiff correctly argues that the ALJ erred in describing the notes of plaintiff's treatment with Dr. Wilson on April 9, 2021. R. 625–36. Beneath the heading entitled "Chief Complaint," the notes reflect not only the reason plaintiff returned for an office visit on April 9, 2021, but also the reasons for prior visits on November 22, 2019, July 15, 2019, and April 5, 2019. R. 627; *see* R. 498–99. Plaintiff stated that his "left wrist is doing fine" on April 15, 2019, not in April 2021 as noted by the ALJ, R. 21, and not on "July 15, 2019" as asserted in plaintiff's brief, Pl.'s Br. 5–6. R. 498–99, 627.

On April 9, 2021, plaintiff complained of "bilateral wrist pain." R. 627. And, contrary to plaintiff's contention that "the severity of the right wrist and left wrist were the same on April 9, 2021," Pl.'s Br. 7, plaintiff conveyed to Dr. Wilson that his right wrist pain exceeded that in the left one. R. 626–27 (noting "Bilateral R>L"); *see* R. 627–28 (noting review of systems, "Musculoskeletal ROS:  positive for – pain in wrist – right").

Though the ALJ failed to note plaintiff's complaints of left wrist pain on April 9, 2021, he nevertheless recognized that Dr. Wilson's physical exam found pain in both wrists. R. 21. The ALJ expressly noted the finding, after the words "bilateral wrists," of "moderate tenderness to palpation of the radiocarpal joints and scapholunate joint," as well as the presence of "edema and synovitis in both joints." *Id.*; *see* R. 629. Stated another way, Dr. Wilson found, and the ALJ recited that plaintiff had some pain, swelling, and inflammation in both wrists. Apparently based on these exam findings, Dr. Wilson ordered (and the ALJ discussed) x-rays of the left wrist that showed "moderate degenerative changes at the radiocarpal joint and mid-carpal joint."[7] *Id.* As noted by the ALJ, Dr. Wilson treated the left wrist with a steroid injection on this occasion. R. 21, 631. As plaintiff correctly observes, Pl.'s Br. 6–7, however, the ALJ failed to note that Dr. Wilson also directed the wearing of bilateral wrist braces for the next four weeks, and later as needed. R. 630–31.

Beyond this particular examination, the ALJ also extensively reviewed the record of plaintiff's history of left and right wrist problems, which the ALJ described as showing "a long-standing history of right wrist pain, with a history of wrist effusions bilaterally." R. 21. It is

_____

[7] X-rays of the right wrist had previously been taken more than once, and as discussed by the ALJ elsewhere, showed evidence of plaintiff's prior right wrist fusion surgery, degenerative changes in multiple adjacent joints, and joint space narrowing. R. 20–21, 326, 629.

undisputed that the ALJ recognized that plaintiff's diagnoses for osteoarthritis (dating back to well before alleged onset date) applied bilaterally.  R. 18 (referencing "OA of the wrists as early as September 2017" and "bilateral wrist OA").  As for distinguishing between the two arms, the ALJ's reference to plaintiff's long-standing history of right wrist pain, rather than bilateral pain, is consistent with the ALJ's consideration of plaintiff's fusion surgery on the right wrist.  R. 21 (discussing x-rays "showing a healed scaphoid capitate fusion" of the right wrist, along with "degenerative changes about [several] adjacent joints").

It is also consistent with the ALJ's review of plaintiff's treatment history and testimony. For example, the ALJ's summary of the treatment history references approximately four times when plaintiff sought treatment associated with the right wrist (January 2019, February 2019, July 2019, and November 2019), as compared to the ALJ's reference to approximately two occasions when plaintiff sought treatment for left wrist pain (March 2020 and April 2021).[8]  R. 20–21. Moreover, as discussed by the ALJ, one of the latter two instances of left wrist pain was attributed to "gouty arthritis" and plaintiff's "noncompliance with [gout] treatment."  R. 21–23  (discussing March 2020 left wrist pain and re-fill of prescription for gout medication); *see* R. 21 (discussing "improvement in [plaintiff's] symptoms when compliant with conservative treatment"); R. 23 (rejecting bilateral, occasional handling limitation proposed on reconsideration because "pain complaints were reasonably controlled when . . . compliant with prescribed treatment").  Further,

---

[8] Of course, an ALJ need not discuss every medical record.  The Court's own review of the record above, however, discloses approximately: (1) 13 times when the plaintiff complained of or sought treatment for right wrist and/or hand pain; R. 310–17, 325, 329, 335–36, 370–73, 375, 470, 493– 94, 496–500, 503; (2) 1 instance in which plaintiff complained of or sought treatment for left wrist and/or hand pain; R. 585, 588–90; and (3) 9 times when plaintiff sought treatment for bilateral wrist and/or hand pain; R. 305, 307, 320–21, 340–43, 346, 377, 381, 625, 627.  This also supports the ALJ's assessment that plaintiff's left wrist and hand conditions were less serious and warranted a finding of more extensive functional abilities on the left than on the right.

in discussing this March 2020 treatment, the ALJ specifically noted that, in the midst of an arthritic flare affecting his left wrist, plaintiff's sensory abilities remained intact and he could "wiggle his fingers and thumb." R. 22. Finally, in discussing plaintiff's hearing testimony, the ALJ highlighted plaintiff's ability to "use[] his left hand to drive," again reflecting a recognition of greater functional abilities with that extremity. R. 20; *see* R. 49 (also testifying that although he has "problems with [his] left hand . . . most of the time, it's my right hand"). Indeed, the ALJ specifically noted plaintiff's "good activities of daily living," including driving with his left hand, as well as cleaning, shopping, etc., as showing his ability to work within the confines of the RFC. R. 22. On this point, the ALJ considered and rejected Dr. Wardell's opinions about more extensive limitations with respect to plaintiff's reaching, fingering, handling, and grasping abilities, as well as plaintiff's ability to report regularly for full-time work, and found that the evidence supported only a frequent limitation for the left upper extremity. *Id.*

Accordingly, the ALJ's recognition that Dr. Wilson found that plaintiff exhibited bilateral pain and swelling on April 9, 2021, as well as his discussion of medical and other evidence of record, obviates any possible harm ensuing from misdescribing plaintiff's subjective complaints. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (noting that the "burden of showing that error is harmful normally falls upon the party attacking the agency's determination"); *see also Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (affirming an ALJ's decision "because there is no question but that [the ALJ] would have reached the same result notwithstanding his initial error"). The ALJ's decision and the RFC selected show that the ALJ fully understood that plaintiff's left wrist was something other than "fine." Nor did the ALJ err in not discussing Dr. Wilson's order for wrist braces on April 9, 2021. The use of this treatment modality does not call into doubt the findings supporting the frequent limitations imposed as to plaintiff's left wrist and hand. Ample

evidence supports the ALJ's conclusion that plaintiff's post-surgical treatment course was conservative and involved mostly medications, injections, and therapeutic exercise. R. 21. For all these reasons, substantial evidence supports the ALJ's RFC determination.

**B.** *The ALJ properly addressed and resolved any apparent conflicts between the RFC's limitations and the DOT.*

Next, plaintiff argues that an apparent conflict exists between the DOT's specification of requirements for three of the four jobs identified by the VE at step five and the limitations posed by the ALJ in the first hypothetical.[9] Pl.'s Br. 8; *see* R. 55–56. Plaintiff identifies this apparent conflict as between the RFC's "occasional" fingering, grasping, handling, and reaching limitation for the dominant upper extremity and the DOT's specification that the three jobs require "'frequent' reaching, handling, and fingering with both upper extremities." Pl.'s Br. 8 (noting also in a footnote that the ticket taker job requires frequent bilateral reaching and handling, but not fingering). Although acknowledging that the VE recognized a possible distinction between the DOT's requirements for the three jobs and the hypothetical, plaintiff claims that the VE's explanation for resolving the conflict was insufficiently specific and a remand is required. *Id.*

The Commissioner responds that the ALJ properly inquired of the VE about any conflicts, apparent or otherwise, between the DOT's job requirements and the hypothetical limitations. Def.'s Mem. 23. The Commissioner contends that the VE not only identified the differences between the same, but also explained that despite any such differences she relied on her professional experience in finding that a person hypothetically so limited could perform the jobs identified. *Id.* Further, the Commissioner argues that the ALJ discussed the discrepancy identified

---

[9] As the fourth job, usher, requires only "occasional" reaching according to the DOT, plaintiff concedes that its requirements do not conflict with the limitations identified by the ALJ. Pl.'s Br. 8 n.3.

by the VE and, after considering the matter independently, expressly credited the VE's conclusion, thereby resolving any such conflict. *Id*. at 23–24.

In *Pearson v. Colvin*, 810 F.3d 204 (4th Cir. 2015), the Fourth Circuit reviewed Social Security Ruling ("SSR") 00-4p, 65 Fed. Reg. 75760 (2000), 2000 WL 1898704, which addressed the methodology for assessing occupational information, including VE testimony, in disability claims. The Fourth Circuit ruled that SSR 00-4p requires an ALJ: (1) to inquire of a VE whether the VE's testimony conflicts with job information contained in the DOT; (2) to also independently identify whether any apparent conflicts exist between the evidence supplied by the VE and the DOT; (3) to seek, with respect to any apparent conflicts identified, an explanation from the VE for any such conflict; and (4) to address whether the VE's "explanation is reasonable and provides a basis for relying on the [VE's] testimony rather than the [DOT]." *Pearson*, 810 F.3d at 208–11.

The DOT specifies that three of the four jobs identified by the VE involve frequent reaching, handling, and fingering; except that the fingering specified for the ticket taker job is only occasional. *See* Mail Clerk, *Dictionary of Occupational Titles* (4th ed. rev. 1991), 1991 WL 671813; Telephone Quotation Clerk, *Dictionary of Occupational Titles* (4th ed. rev. 1991), 1991 WL 672194; Ticket Taker, *Dictionary of Occupational Titles* (4th ed. rev. 1991), 1991 WL 672863. For these positions, the DOT describes "frequently" as "[e]xists from 1/3 to 2/3 of the time," and "occasionally" as "[e]xists up to 1/3 of the time." *Id*.

After the VE identified these jobs as available, the ALJ asked her to compare the limitations in the first hypothetical to the DOT's requirements for those occupations. R. 56. The ALJ then asked whether any conflicts, apparent or otherwise, existed between the two. *Id*. The VE responded noting that: (1) the hypothetical contained more detail than the DOT listings in specifying occasional pushing and pulling with the upper extremities, when the DOT apparently

24

specified none; and (2) unlike the posited limitations, the DOT specified no distinctions between dominant and non-dominant upper extremities in relation to fingering, reaching, and handling. R. 56–57. Notwithstanding the DOT's failure to address any difference in capacities in dominant and non-dominant upper extremities, the VE testified that she relied upon her professional experience in finding the foregoing jobs as falling within the RFC and available in the national economy. R. 57. When allowed to question the VE about such matters, plaintiff's attorney declined. *Id.*

Plaintiff's challenge arises from an apparent conflict between the DOT's specification of frequent reaching, handling, and fingering (except for fingering for ticket takers) and the ALJ's limitation for only occasional fingering, grasping, handling, and reaching with the dominant upper extremity. When confronted with a similar issue in *Pearson*, the Fourth Circuit found that a like requirement for "frequent reaching" in several other DOT job listings "*may* require" bilateral reaching. 810 F.3d at 210–11. In *Pearson*, this meant that the VE's testimony that the claimant, who was limited to only occasional reaching in the nondominant arm, could perform the jobs at issue "*apparently* conflict[ed] with the [DOT]." *Id.* at 211. The same type of apparent conflict exists here; if the DOT is construed to require frequent bilateral reaching, handling, and fingering that would conflict with the limitation to only occasional fingering, grasping, handling, and reaching in the right wrist and arm.

Unlike in *Pearson*, however, here the ALJ asked the VE to review both the limitations and the DOT's requirements and expressly elicited information about conflicts, apparent or otherwise. In doing so, the ALJ satisfied the first two steps of *Pearson* and plaintiff does not contend otherwise. *See* Pl.'s Br. 8. In response, the VE identified the two matters noted above. R. 56–57. Recognizing the possibility of such a conflict, the VE stated that she identified the occupations (ticket taker, mail sorter, and telephone information clerk) based upon her own professional

25

experience. *Id.* This satisfied *Pearson's* third requirement to seek an explanation for any apparent conflict. *See Pearson*, 810 F.3d at 209–10.

Plaintiff complains that the VE failed to explain how or why the three jobs could still be performed despite the conflict. Pl.'s Br. 8. Here, however, the explanation is both implicit and patent; namely, that to the extent the DOT arguably requires the aforementioned frequent, bilateral capacities, the VE opined based on her professional experience that such occupations can be performed by one who only occasionally possesses such capacities in the dominant right arm, but frequently possesses the same in the left arm. This conclusion is confirmed by the VE's testimony about her exclusion of certain potential sedentary jobs because they "require frequent bilateral use of the upper extremities." R. 56.

This leaves *Pearson's* final inquiry into whether the ALJ evaluated whether the VE's explanation provided reasonable grounds for relying on the VE's testimony over the DOT. *See Pearson*, 810 F.3d at 209–10. Here, the ALJ did just that, by first identifying and describing a discrepancy existing between the VE's testimony and the DOT's job requirements. R. 24. The ALJ next found that the VE reasonably explained, based upon her experience and education, why plaintiff remained able to perform the other identified jobs existing in the national economy. *Id.* For these reasons, the ALJ credited the VE's testimony over any arguable job requirements in the DOT. *Id.*

In relying upon the VE's professional experience, the ALJ's decision comported with both a ruling of the Social Security Administration and caselaw. *See Biestek*, 139 S. Ct. at 1152–53 (noting experts may testify based upon "data otherwise developed from their own 'experience in job placement or career counseling'" (citation omitted)); *cf.* 20 C.F.R. § 404.1566(e) (specifying that the services of a vocational *expert* may be engaged when disability turns upon the issue of

"whether your work skills can be used in other work and the specific occupations in which they can be used"). SSR 00-4p indicates that an ALJ may decide, as here, to rely upon a VE's testimony due to the "VE's . . . experience in job placement or career counseling." SSR 00-4p, 2000 WL 1898704, at *2. Similarly, courts in the Fourth Circuit have regularly upheld an ALJ's reliance on similar testimony from a VE. *See, e.g., Conway v. Saul*, No. 1:18cv483, 2019 WL 4102184, at *6 (M.D.N.C. Aug. 29, 2019) (finding that even if a conflict existed, the ALJ addressed the issue satisfactorily when the VE testified that the DOT did not address the given issue but determined the job could be performed based upon the VE's "training, education, and experience"), *report and recommendation adopted*, 2019 WL 4674759 (M.D.N.C. Sept. 25, 2019); *Kane v. Saul*, No. 3:18cv746, 2019 WL 7562760, at *14–15 (E.D. Va. Aug. 20, 2019) (noting the ALJ adequately resolved any potential conflict, by relying on expert knowledge and experience in the field), *report and recommendation adopted*, 2020 WL 130134 (E.D. Va. Jan. 10, 2020); *Ray v. Berryhill*, No. 2:16cv486, 2017 WL 3599645, at *17 (E.D. Va. Apr. 28, 2017) (affirming decision when "the DOT's job descriptions for the three positions identified by the VE do not explicitly address whether the jobs must or may be performed in either a seated or standing position" and the VE testified that a claimant with certain limitations could perform those jobs), *report and recommendation adopted*, 2017 WL 3599637 (E.D. Va. Aug. 21, 2017); *see also Hershel G. v. Saul*, No. 7:18cv266, 2019 WL 4383141, at *6 (W.D. Va. Aug. 26, 2019) (noting that although the DOT did not address unilateral manipulative restrictions, the ALJ appropriately relied on the VE's testimony about her professional experience), *report and recommendation adopted*, 2019 WL 4345377 (W.D. Va. Sept. 12, 2019).

For all these reasons, the ALJ committed no error in addressing and resolving any conflicts between the RFC's limitations and the DOT.

**C.**   ***Plaintiff's remaining argument about whether 5,000 constitutes a significant number of jobs in the national economy is moot.***

Finally, plaintiff argues that the 5,000 usher jobs identified by the VE fail to constitute a significant number of jobs in the national economy sufficient to form the basis for denying disability benefits. Pl.'s Br. 9–10. Plaintiff acknowledges, however, that this argument is only "relevant" if the Court accepts his second argument about unresolved conflicts with the DOT for the other three jobs. *Id.* Having rejected the second argument, and because the jobs of ticket taker, mail sorter, and telephone information clerk remain available for someone of plaintiff's background and RFC, no need exists for the Court to address how many usher jobs constitute a significant number of jobs in the national economy. *See, e.g., Marco R.M. v. Kijakazi*, No. 2:21cv38, 2022 WL 257840, at *9 (E.D. Va. Jan. 10, 2022) (noting that "because both positions are available to Plaintiff, Plaintiff's argument that the table worker position alone, with 3,000 jobs nationally, does not constitute a significant number of jobs, is moot"), *report and recommendation adopted*, 2022 WL 256501 (E.D. Va. Jan. 26, 2022).

## VI.   <u>RECOMMENDATION</u>

For all these reasons, this Court recommends that plaintiff's motion for summary judgment (ECF No. 9) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 11) be **GRANTED**.

## VII.   <u>REVIEW PROCEDURE</u>

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C.

§ 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of

the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A

party may respond to any other party's objections within fourteen (14) days after being served with

a copy thereof.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the

Federal Rules of Civil Procedure).

     2.     A district judge shall make a *de novo* determination of those portions of this report

or specified findings or recommendations to which objection is made.

     The parties are further notified that failure to file timely objections to the findings and

recommendations set forth above will result in a waiver of appeal from a judgment of this Court

based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*,

737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).


                        Robert J. Krask
               UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
February 15, 2023